KENNETH B. WILSON (SBN 130009)
kwilson@carrferrell.com
CHRISTOPHER P. GREWE (SBN 245938)
cgrewe@carrferrell.com
CARR & FERRELL *LLP*
2200 Geng Road
Palo Alto, California 94303
Telephone: (650) 812-3400
Facsimile: (650) 812-3444

Attorneys for Plaintiffs
EXCELSTOR TECHNOLOGY, INC.,
EXCELSTOR TECHNOLOGY LIMITED,
EXCELSTOR GROUP LIMITED,
EXCELSTOR GREAT WALL TECHNOLOGY
LIMITED and SHENZHEN EXCELSTOR
TECHNOLOGY LIMITED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| EXCELSTOR TECHNOLOGY, INC., a Delaware corporation; EXCELSTOR TECHNOLOGY LIMITED, a Hong Kong corporation; EXCELSTOR GROUP LIMITED, a Cayman Islands corporation; EXCELSTOR GREAT WALL TECHNOLOGY LIMITED, a Cayman Islands corporation; and SHENZHEN EXCELSTOR TECHNOLOGY LIMITED, a Chinese corporation,<br><br>Plaintiffs,<br><br>v.<br><br>PAPST LICENSING GMBH & CO. KG, a German corporation; and DOES 1 through 10, inclusive,<br><br>Defendants. | CASE NO. C09-2055 PJH<br><br>**SECOND AMENDED COMPLAINT FOR DECLARATORY RELIEF RE PATENT UNENFORCEABILITY AND NON-INFRINGEMENT, BREACH OF CONTRACT, BREACH OF THE IMPLIED COVENANT OF GOOD FAITH, UNJUST ENRICHMENT, CONVERSION, FRAUD, AND UNFAIR BUSINESS PRACTICES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiffs ExcelStor Technology, Inc., ExcelStor Technology Ltd., ExcelStor Group Limited, ExcelStor Great Wall Technology Limited, and Shenzhen ExcelStor Technology Limited (collectively, “Plaintiffs” or “ExcelStor”) hereby allege for their Complaint against defendant Papst Licensing GmbH & Co. KG (“Defendant” or “Papst”), on personal knowledge as to their own

activities and on information and belief as to the activities of others, as follows:

**THE PARTIES**

1. Plaintiff ExcelStor Technology, Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at 900 East Hamilton Avenue, Suite 100, Campbell, California. Since at least 2003, ExcelStor Technology, Inc. has maintained an office in Campbell, California, and its General Manager lives in California and works primarily out of the California office.

2. Plaintiff ExcelStor Technology Limited is a corporation organized and existing under the laws of Hong Kong, with its principal place of business at Suite 1507, Greenfield Tower, Concordia Plaza, No. 1 Science Museum Road, Tsimshatsui, Kowloon, Hong Kong.

3. Plaintiff ExcelStor Group Limited is a corporation organized and existing under the laws of the Cayman Islands, with its registered office at Scotia Centre, 4th Floor, P.O. Box 2804, George Town, Grand Cayman, Cayman Islands.

4. Plaintiff ExcelStor Great Wall Technology Limited is a corporation organized and existing under the laws of the Cayman Islands, with its registered office at Scotia Centre, 4th Floor, P.O. Box 2804, George Town, Grand Cayman, Cayman Islands.

5. Plaintiff Shenzhen ExcelStor Technology Limited is a corporation organized and existing under the laws of China, with its principal place of business at 5/F Kaifa Complex, Phase 2, 7006 Caitian Road North, Futian District, Shenzhen, China.

6. Collectively, the ExcelStor companies have been leaders in the design, development, manufacture and distribution of hard disk drive (“HDD” or “hard disk”) products, primarily in China. In fact, ExcelStor is the only HDD producer with its own brand in China. ExcelStor has also acted as a “contract manufacturer” for various companies, including Hitachi Global Storage Technologies Singapore Ltd. and its affiliates such as Hitachi Data Systems and Hitachi, Ltd. (“Hitachi”). As a contract manufacturer for Hitachi, ExcelStor has manufactured hard drives according to Hitachi’s designs and then sold them to Hitachi (“Hitachi-ExcelStor Contract Drives”).

7. Defendant Papst Licensing GmbH & Co. KG is a privately held corporation organized under the laws of the Federal Republic of Germany with its principal place of business at Bahnhofstr. 33, 78112 St Georgen, Germany. As part of its activities, Papst has become the assignee of several United States Patents involving HDDs, including but not limited to: Nos. B1 Re. 32,702; 4,519,010; 4,535,373; 4,922,406; 5,708,539; 5,729,403; Re. 35,792; 5,777,822; 5,796,548; 5,216,557; 5,424,887; 5,446,610; 5,557,487; 5,661,351; 5,801,900; 5,864,443; Re. 34,412; and Re. 37,058 (collectively, the "Papst HDD Patents" or the "Patents in Suit").

## JURISDICTION AND VENUE

8. This Court has jurisdiction over the subject matter of ExcelStor's claims pursuant to 28 U.S.C. §§ 1331, 1338 and 1367, as the claim for declaratory relief of patent unenforceability and non-infringement arises out of the patent laws of the United States, and the remaining claims are so related to the patent unenforceability and non-infringement claim that they form part of the same case or controversy under Article III of the United States Constitution.

9. Venue is proper in this judicial district under 28 U.S.C. § 1391 because, among other reasons, defendant Papst is an alien, and a substantial part of the events giving rise to ExcelStor's claims occurred in this district.

## INTRA-DISTRICT ASSIGNMENT

10. Pursuant to Local Rules 3-2(c) and 3-5, this action may be assigned to any division of this district because it is an Intellectual Property Action.

## FACTUAL BACKGROUND

### Papst's 2002 Enforcement of the Papst HDD Patents in California Against ExcelStor

11. On or about July 15, 2002, Papst filed a patent infringement lawsuit against Western Digital Corporation ("WDC"), Seagate Technology LLC ("Seagate"), Veritas Software Technology Corporation ("Veritas"), ExcelStor Technology Limited, Shenzhen ExcelStor Technology Ltd., and ExcelStor Technology, Inc. in the U.S. District Court for the Central District of California, alleging

that each of the defendants infringed the Papst HDD Patents, which are also at issue in the current action (the "ExcelStor Lawsuit"). While Papst availed itself of the California courts to sue the ExcelStor entities, the Complaint did not specifically allege that the ExcelStor entities had any relationship with the State of California.

12. The accused products in the ExcelStor Lawsuit included products that ExcelStor was contract manufacturing for Hitachi. However, Hitachi itself was not named as a party to the ExcelStor Lawsuit.

13. Having successfully used litigation to force ExcelStor to the bargaining table, Papst and ExcelStor began to engage in settlement discussions in early 2003. In connection with these discussions, Papst engaged in dozens of communications with ExcelStor, primarily through ExcelStor's counsel in California. In fact, Papst directed more than a dozen letters and phone calls to ExcelStor representatives (including counsel) in California in the course of conducting these negotiations.

14. During these negotiations, ExcelStor advised Papst that it was performing contract manufacturing for Hitachi (and/or a predecessor in interest of Hitachi's HDD business), and clearly expressed to Papst that it was unwilling to pay royalties on products that it contract manufactured for other Papst licensees such as Hitachi. Papst, via its primary contract negotiators Jerold Schnayer and Tobias Kessler (among others), made representations that led ExcelStor to reasonably believe that the license agreement that they were entering into would not require ExcelStor to pay royalties on contract manufactured product for other Papst licensees, and that if ExcelStor paid such royalties, they would be reimbursed by Papst.

**<u>Papst's Licenses with Hitachi</u>**

15. In or about 1998, well prior to filing suit against ExcelStor, Papst had entered into a royalty licensing agreement with Hitachi and/or a predecessor in interest of Hitachi's HDD business for some or all of the Papst HDD Patents (the "1998 Hitachi License Agreement"). Under the 1998 Hitachi License Agreement, Hitachi paid royalties in exchange for a license to use the Papst HDD Patents in connection with its manufacturing and distribution of HDDs. Papst has

refused to allow ExcelStor and its counsel to view the terms of the 1998 Hitachi License Agreement.

16. Papst subsequently entered into negotiations with Hitachi regarding a new license agreement. These negotiations took place at least in part during the same period of time in which Papst was negotiating with ExcelStor. During these negotiations, Hitachi advised Papst that it wanted its license to cover its contract manufacturers like ExcelStor, and Papst led Hitachi to believe that HDD products sold by Hitachi that were manufactured by a contract manufacturer like Excelstor according to Hitachi's designs would be licensed to Hitachi under the Papst HDD Patents.

17. As a result of these negotiations, in 2004 Papst entered into another royalty licensing agreement for some or all of the Papst HDD Patents with Hitachi, the terms of which differed in certain measures from the 1998 Hitachi License Agreement (the "2004 Hitachi License Agreement"). Under the 2004 Hitachi License Agreement, Hitachi paid a lump sum royalty in exchange for a perpetual license to use the Papst HDD Patents in connection with its manufacturing and distribution of HDDs. Although the 2004 Hitachi License Agreement was executed after Papst entered into a license agreement with ExcelStor, the effective date of the 2004 Hitachi License Agreement was January 1, 2003.

18. At least the 2004 Hitachi License Agreement included "have made" rights that Papst led Hitach to believe would enable Hitachi to use a contract manufacturer, like ExcelStor, to make licensed products based upon Hitachi designs without the contract manufacturer having to pay further royalties.

**<u>The Papst/ExcelStor License Agreement</u>**

19. On January 20, 2004, Papst consummated its efforts to coerce ExcelStor into paying royalties under the Papst HDD Patents by entering into a written agreement with ExcelStor to settle the ExcelStor Lawsuit (the "ExcelStor Agreement"). Papst sent the final version of the ExcelStor Agreement to ExcelStor in California, and ExcelStor executed the Agreement in California.

20. Pursuant to Paragraphs 2.1 and 2.2 of the ExcelStor Agreement, Papst granted

ExcelStor a license to make, have made, use, offer to sell and sell products "to the extent that they are covered by the LICENSED PATENT CLAIMS." However, the ExcelStor Agreement purported to require ExcelStor to pay a per unit royalty for each HDD product "manufactured or sold by any of the ExcelStor entities any place in the world," including countries in which Papst had no patent protection, and regardless of whether they were covered by the Papst HDD Patents.

21. The ExcelStor Agreement specifically provided that ExcelStor would pay a per-unit royalty for each HDD, even for HDDs that ExcelStor "contract manufactures" for its customers, such as Hitachi. However, to accommodate ExcelStor's concerns, Paragraph 4.6 of the ExcelStor Agreement further required Papst to give ExcelStor written notice on a quarterly basis as to whether Papst had been paid a royalty by anyone other than ExcelStor for the HDDs that ExcelStor "contract manufactures" for ExcelStor customers, and in the event that Papst had obtained such a royalty, Papst was obligated to reimburse ExcelStor's royalty payments for those HDDs.

22. The ExcelStor Agreement stated that Papst would covenant not to sue ExcelStor for infringement of the Patents-in-Suit, but only "to the extent that the ExcelStor Entities timely make the payments" stated in the Agreement. In other words, if ExcelStor were to fail to timely make a payment that Papst believes is due under the ExcelStor Agreement, Papst reserved the right to bring a claim for infringement of the Patents-in-Suit. In addition, in the event that any one of the ExcelStor Entities defaulted in or breached any material provision of the ExcelStor Agreement, Papst reserved the right to cancel the license granted to all of the ExcelStor Entities upon thirty days written notice.

23. Under Paragraph 11 of the ExcelStor Agreement, Papst was required to send all notices pursuant to the ExcelStor Agreement to Der-Chang Hsieh on behalf of all of the ExcelStor entities at an address in Hong Kong, as well as to ExcelStor's counsel in California. At the time Papst entered into the ExcelStor Agreement, Papst was aware that Der-Chang Hsieh actually lived in California and worked in an ExcelStor office in California.

**<u>Papst's Misconduct Continued After Execution of the ExcelStor Agreement</u>**

24. Beginning on April 2, 2004, Papst sent quarterly notice letters to ExcelStor in Hong

Kong and California that contained at least two material written misrepresentations. First, Papst falsely stated that "no company other than ExcelStor has paid to Papst Licensing a royalty concerning the above-identified Contract Manufacturing HDDs." This representation was false because, as discussed above, Papst had collected duplicate royalty payments – once from Hitachi and once from ExcelStor – for the Hitachi-ExcelStor Contract Drives. Second, Papst misrepresented that pursuant to Paragraph 4.6 of the ExcelStor Agreement, Papst was not obligated to reimburse ExcelStor any portion of the royalty payment made for the Hitachi-ExcelStor Contract Drives. This second statement was false because, as discussed above, Papst collected duplicate royalty payments – once from Hitachi and once from ExcelStor – for the Hitachi-ExcelStor Contract Drives. Papst was required to reimburse ExcelStor's royalty payment on Hitachi-ExcelStor Contract Drives. Papst continued to make nearly identical written misrepresentations in its subsequent quarterly notice letters to ExcelStor, including letters dated June 24, 2004, December 21, 2004, April 14, 2005, June 28, 2005, September 15, 2005, April 4, 2006, August 10, 2006, September 20, 2006, January 17, 2007, and May 31, 2007.

25. During mid-2004, ExcelStor began hearing rumors that Hitachi had already secured a license for Hitachi-ExcelStor Contract Drives. Inquiries of Hitachi were made, and on July 1, 2004, Hitachi provided ExcelStor with a letter that read in relevant part: "HDD products sold by [Hitachi] which are made by ExcelStor for [Hitachi] according to [Hitachi's] designs are licensed under patents owned by Papst, except for patents which are directly infringed by spindle motors or integrated baseplate/spindle motor assemblies for HDD's."

26. Upon receiving this information, ExcelStor contacted Papst regarding Hitachi's representation that Hitachi had a license agreement with Papst that covered the Hitachi-ExcelStor Contract Drives. In response, Papst reiterated through correspondence sent to ExcelStor via its counsel in California that Papst was not obligated to reimburse ExcelStor for royalty payments made on Hitachi-ExcelStor Contract Drives.

27. Due to the confidentiality clause in the Papst-Hitachi Agreements, Papst has refused to allow ExcelStor or its counsel to see the entirety of the Hitachi Agreements. However, Papst ultimately provided ExcelStor with a redacted version of the 2004 Hitachi License Agreement that

confirmed that Papst's previous representations had been false. Papst had collected duplicate royalty payments – once from Hitachi and once from ExcelStor – for the Hitachi-ExcelStor Contract Drives and, thus, was required to reimburse ExcelStor for ExcelStor's royalty payment on Hitachi-ExcelStor Contract Drives as required by Paragraph 4.6 of the ExcelStor Agreement. Papst, however, continued to make written misrepresentations as noted above in its subsequent quarterly notice letters to ExcelStor that no company other than ExcelStor has paid to Papst Licensing a royalty concerning the "Contract Manufacturing HDDs" and that Papst was not obligated to reimburse ExcelStor any portion of the royalty payment made for the Hitachi-ExcelStor Contract Drives.

28. Following execution of the ExcelStor Agreement, Papst has collected more than $7,989,360 in royalties from ExcelStor for products that ExcelStor manufactured for Hitachi, and for which Hitachi had already paid royalty payments to Papst under the Hitachi License Agreements. However, Papst has failed to provide ExcelStor with the required written notice under the ExcelStor Agreement that it has collected double royalties, has and has failed to reimburse ExcelStor for the royalty payments ExcelStor made for products contract manufactured for Hitachi as mandated by the ExcelStor Agreement.

29. In addition, although Papst only had patent protection in the United States and a handful of other countries, Papst has insisted that the scope of Licensed Products include all hard disk drive units "manufactured or sold by any one of the ExcelStor Entities any place in the world at any time (irrespective of where such HDDs are manufactured or sold)," and has required that ExcelStor pay Papst a patent royalty payment for each Licensed Product or Contract Manufactured Product "manufactured or sold by any one of the ExcelStor entities any place in the world." In other words, Papst has required ExcelStor to pay patent royalties for products manufactured and sold in countries in which Papst had no patent protection. Papst has collected significant patent royalties from ExcelStor for products that ExcelStor manufactured and sold in countries in which Papst has no patent protection.

30. Papst's conduct has impermissibly broadened the physical or temporal scope of the Papst HDD Patents with anticompetitive effect. Papst's collection of royalties for products on

which royalties have already been paid and/or for products manufactured and sold in countries in which Papst had no patent protection substantially and adversely affects ExcelStor in particular and competitors in the HDD industry in general because the price of HDDs must account for the collection of royalties where no royalties are owed and/or for the double payment of royalties by Hitachi and its contract manufacturer. This collection of royalties by Papst does not promote or regulate competition; it has the effect of suppressing competition by increasing the manufacturing cost of a Hitachi-ExcelStor Contract Drive or other ExcelStor HDDs. ExcelStor must either increase the cost of its HDDs and/or decrease its profit margin. Papst has unfairly restrained competition in the HDD market because of such actions and because Papst has taken the position by litigation and in the press that the Papst HDD Patents are essentially necessary to the manufacture of HDDs.

**Papst's Enforcement of the Papst HDD Patents Against Others in California**

31. Since at least 1994, Papst has aggressively sought to enforce the Papst HDD Patents by sending threatening letters to and/or filing patent infringement lawsuits against virtually the entire HDD industry. In California alone, Papst has maintained at least half a dozen lawsuits for infringement of the Papst HDD Patents against more than a dozen entities, including three of the ExcelStor companies, and has named in those lawsuits defendants who reside both within and outside of California. Papst has coerced tens of millions of dollars of royalty payments through its enforcement of the Papst HDD Patents in California, including more than ten million dollars from ExcelStor alone.

32. On or about April 18, 1994, Papst filed a patent infringement lawsuit against Western Digital Corporation (WDC) in the U.S. District Court for the Central District of California, alleging that WDC infringed at least four of the Patents-in-Suit. According to the Complaint, WDC had its principal place of business in California. By this lawsuit and/or Papst's related patent enforcement efforts, Papst coerced WDC into taking a license and paying royalties to Papst under certain of the Papst HDD Patents, although the license was not entered into until several years later. Papst wrote letters and/or made telephone calls to the California offices of WDC and/or its counsel

over a period of years in furtherance of its enforcement efforts, and the license agreement was entered into and performed by WDC in California.

33. On or about April 19, 1994, Papst filed a patent infringement lawsuit against Micropolis Corporation ("Micropolis") in the U.S. District Court for the Central District of California, alleging that Micropolis infringed at least one of the Patents-in-Suit. According to the Complaint, Micropolis had its principal place of business in California. ExcelStor is unaware of how that lawsuit was resolved.

34. On or about September 17, 1998, Papst stipulated to voluntarily transfer to the U.S. District Court for the Northern District of California a patent infringement lawsuit that had originally been filed against Fujitsu Ltd., Fujitsu Computer Products of America, Inc., Fujitsu PC Corporation (collectively referred to as "Fujitsu"), Quantum Corporation ("Quantum"), Matsushita Electric Industrial Co., Ltd., Matsushita Kotobuki Electronics Industries, Ltd., and Matsushita Electric Corp. of America (collectively referred to as "Matsushita") in the U.S. District Court for the Northern District of Illinois. This lawsuit alleged that the defendants infringed at least thirteen of the Patents-in-Suit. According to the Complaint, Fujitsu PC Corporation and Fujitsu Computer Products of America, Inc. were both California corporations, although they had been dismissed from the lawsuit by the time of the transfer, and Quantum Corporation had its principal place of business in California. However, the other defendants were not alleged to be California entities. By this lawsuit and/or Papst's related enforcement efforts, Papst coerced Quantum's successor-in-interest and Matsushita into taking a license and paying royalties to Papst under the Patents-in-Suit. Papst also sent patent enforcement correspondence to Fujitsu and Quantum in California. In addition, in the course of settling the litigation, Papst wrote letters and/or made telephone calls to the California offices of at least Quantum and/or its successor-in-interest and counsel in conducting these negotiations, and the license agreement was entered into and performed by Quantum's successor-in-interest in California.

35. On or about March 18, 1999, Papst filed a patent infringement lawsuit against Maxtor Corporation ("Maxtor") in the U.S. District Court for the Northern District of California, alleging that Maxtor infringed at least fifteen of the Patents-in-Suit. According to the Complaint,

Maxtor had its principal place of business in California. By this lawsuit and/or Papst's related enforcement efforts, Papst coerced Maxtor into taking a license and paying royalties to Papst under the Patents-in-Suit. Papst also sent patent enforcement correspondence to Maxtor in California. In addition, in the course of settling the litigation, Papst wrote letters and/or made telephone calls to the California offices of Maxtor and/or its counsel in conducting these negotiations, and the license agreement was entered into and performed by Maxtor in California.

36. On or about July 15, 2002, as discussed above, Papst filed the ExcelStor Lawsuit against WDC, Seagate, Veritas, ExcelStor Technology Limited, Shenzhen ExcelStor Technology Ltd., and ExcelStor Technology, Inc. in the U.S. District Court for the Central District of California, alleging that each of the defendants infringed the Patents-in-Suit. The Complaint alleged that WDC, Seagate and Veritas all had their principal place of business in California. Through the ExcelStor Lawsuit and/or Papst's related enforcement efforts, Papst coerced WDC, Seagate and Veritas into taking a license and paying royalties to Papst under the Patents-in-Suit. Papst also sent patent enforcement correspondence to WDC, Seagate and Veritas in California. In addition, in the course of settling the litigation, Papst wrote letters and/or made telephone calls to the California offices of WDC, Seagate and Veritas and/or their counsel in conducting these negotiations, and the license agreements were entered into and performed by WDC, Seagate and Veritas in California.

37. On or about September 26, 2005, Papst filed a patent infringement lawsuit against Cornice, Inc. ("Cornice"), SAE Magnetics Limited ("SAE Magnetics") and TDK Corporation ("TDK") in the U.S. District Court for the Northern District of California, alleging that the defendants infringed at least two of the Patents-in-Suit. In this lawsuit, Papst further alleged that TDK breached a patent license agreement with Papst by not properly reporting to Papst pursuant to the terms of the license agreement. According to the allegations of the Complaint, none of these three defendants was either incorporated in California or had its principal place of business in California.

**Existence of Case or Controversy Concerning Patent Unenforceability and Non-Infringement**

38. Prior to filing this lawsuit, ExcelStor believed that the Patents-in-Suit were unenforceable due to Papst's patent misuse in unlawfully coercing certain patent royalties from ExcelStor, and that ExcelStor could not be held liable for infringing the Papst HDD Patents because they are unenforceable. However, Papst has claimed and continues to claim a right to royalties under those patents. As a result, ExcelStor reasonably believed that Papst would have filed suit against ExcelStor for patent infringement if ExcelStor had refused to make royalty payments under the ExcelStor Agreement.

39. The reasonableness of ExcelStor's belief that Papst would file suit against ExcelStor for patent infringement if ExcelStor refused to make royalty payments under the ExcelStor Agreement is corroborated by Papst's conduct with respect to TDK. According to the 2005 Complaint filed against TDK by Papst, TDK failed to fully make royalty payments under its patent license agreement with Papst. It appears from that Complaint that Papst responded to this failure to fully make royalty payments by filing a suit for both patent infringement and breach of contract against TDK in federal court in California. It is reasonable to assume that Papst would have taken a similar course of action if ExcelStor had stopped making payments to Papst under the ExcelStor Agreement.

40. Within the past several months, Papst has taken the position that ExcelStor has failed to fully make royalty payments under the ExcelStor Agreement. In particular, Papst has taken the position that ExcelStor is obligated to make royalty payments to Papst for the Iomega Rev, a product that ExcelStor contract manufactured for Iomega Corporation. ExcelStor believes that no royalty payment is owed, both because the Patents-in-Suit are unenforceable (and ExcelStor therefore cannot be held liable for infringement of those patents) and because the Iomega Rev is not covered by the definition of Licensed Products in the ExcelStor Agreement. ExcelStor reasonably believes that Papst could assert a claim for patent infringement against ExcelStor based on ExcelStor's unwillingness to pay royalties on these drives, although ExcelStor believes that any such claim would be without merit. In fact, the only claim Papst could bring if the Iomega Rev falls outside the scope of the ExcelStor Agreement is a claim for patent infringement.

41. There is nothing in the ExcelStor Agreement that prohibits ExcelStor from challenging the enforceability of the Papst HDD Patents.

## FIRST CAUSE OF ACTION

(Declaratory Relief of Patent Unenforceability and Non-Infringement)

42. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 41 of this Complaint as if fully set forth in this Paragraph.

43. ExcelStor contends that it is not obligated to make royalty payments to Papst under the ExcelStor Agreement and not liable for claims of patent infringement of the Papst HDD Patents because the Papst HDD Patents are unenforceable due to patent misuse. Specifically, ExcelStor contends that by improperly demanding and collecting royalties from ExcelStor under the ExcelStor Agreement for the manufacture and sale of products for which Papst had already collected royalties from Hitachi under the Hitachi License Agreements, and by demanding and collecting patent royalties from ExcelStor under the ExcelStor Agreement for the manufacture and sale of products in countries in which Papst has no patent protection, Papst has impermissibly broadened the physical or temporal scope of the patent grant for the Papst HDD Patents with anticompetitive effect, thereby rendering the Papst HDD Patents unenforceable due to patent misuse. Papst disputes these contentions.

44. The dispute between ExcelStor and Papst regarding the unenforceability of the Papst HDD Patents and ExcelStor's corresponding immunity from any potential liability for infringement of those patents is definite and concrete, touching the legal relations of the parties, who clearly have adverse legal interests regarding these issues. Moreover, this dispute is real and substantial, and of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. Finally, this dispute permits specific relief through a decree of a conclusive character (i.e., that the Papst HDD Patents are unenforceable due to patent misuse based on Papst's misconduct in enforcing and licensing its patents and that ExcelStor therefore cannot be liable for infringing these patents), as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. Put another way, a valid and justiciable controversy has arisen and exists between ExcelStor and

Papst regarding the unenforceability of the Papst HDD Patents and ExcelStor's potential liability for infringement of those patents.

45. ExcelStor desires a judicial determination and declaration regarding the unenforceability of the Papst HDD Patents and the parties' respective rights and obligations concerning such patents, including the absence of any viable claim for infringement of those patents, and such a determination is necessary and appropriate at this time.

**SECOND CAUSE OF ACTION**
(Breach of Contract)

46. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 45 of this Complaint as if fully set forth in this Paragraph.

47. On January 20, 2004, ExcelStor and Papst entered into the ExcelStor Agreement, which constitutes a valid, binding agreement between the parties.

48. ExcelStor has performed all of its obligations under the ExcelStor Agreement, except those obligations that it was prevented or excused from performing.

49. Papst has breached the ExcelStor Agreement by, among other things, failing to provide notice to ExcelStor that Hitachi had already paid to Papst a royalty for Hitachi-ExcelStor Contract Drives and refusing to reimburse ExcelStor for royalty payments made for Hitachi-ExcelStor Contract Drives to the extent that Papst had previously received royalty payments from Hitachi.

50. As a direct and proximate result of Papst's breach of the ExcelStor Agreement, ExcelStor has been damaged in an amount to be determined at trial, but in excess of $7,989,360.

**THIRD CAUSE OF ACTION**
(Breach of Implied Covenant of Good Faith and Fair Dealing)

51. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 50 of this Complaint as if fully set forth in this Paragraph.

52. Papst unfairly interfered with ExcelStor's right to receive the benefits of the

ExcelStor Agreement, including receiving notice that Hitachi had paid to Papst a royalty for Hitachi-ExcelStor Contract Drives and receiving reimbursement for royalty payments made for Hitachi-ExcelStor Contract Drives to the extent that Papst had previously received royalty payments from Hitachi.

53. As a direct and proximate result of Papst's unfair interference with ExcelStor's right to receive the benefits of the ExcelStor Agreement, ExcelStor has been damaged in an amount to be determined at trial, but in excess of $7,989,360.

**FOURTH CAUSE OF ACTION**

(Unjust Enrichment)

54. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 53 of this Complaint as if fully set forth in this Paragraph.

55. Papst has been unjustly enriched by unlawfully retaining patent royalty payments made by ExcelStor for HDDs to the extent that Papst had previously received royalty payments from Hitachi for such products or for drives manufactured and sold by ExcelStor in countries in which Papst has no patent protection.

56. It is unfair and unjust for Papst to retain patent royalty payments made by ExcelStor for HDDs to the extent that Papst had previously received royalty payments from Hitachi for such products or for drives manufactured and sold by ExcelStor in countries in which Papst has no patent protection.

57. As a direct and proximate result of Papst's unjust enrichment, ExcelStor has been damaged in an amount to be determined at trial, but in excess of $10,600,000.

**FIFTH CAUSE OF ACTION**

(Conversion)

58. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 57 of this Complaint as if fully set forth in this Paragraph.

59. ExcelStor is entitled to immediate reimbursement of patent royalty payments made

by ExcelStor for HDDs to the extent that Papst had previously received royalty payments from Hitachi for such products or for drives manufactured and sold by ExcelStor in countries in which Papst has no patent protection.

60. Any monies received from ExcelStor by Papst as royalty payments made for HDDs to the extent that Papst had previously received royalty payments from Hitachi for such products or for drives manufactured and sold by ExcelStor in countries in which Papst has no patent protection are rightfully the property of ExcelStor.

61. Papst unfairly interfered with ExcelStor's right to retain monies paid to Papst as royalty payments for HDDs to the extent that Papst had previously received royalty payments from Hitachi for such products or for drives manufactured and sold by ExcelStor in countries in which Papst has no patent protection.

62. ExcelStor has demanded that Papst reimburse ExcelStor for royalty payments made for HDDs to the extent that Papst had previously received royalty payments from Hitachi for such products or for drives manufactured and sold by ExcelStor in countries in which Papst has no patent protection, but Papst refuses.

63. As a direct and proximate result of Papst's conversion, ExcelStor has been damaged in an amount to be determined at trial, but in excess of $10,600,000.

64. In committing its acts of conversion, Papst has been guilty of malice, fraud and/or oppression, thereby entitling ExcelStor to recover punitive damages in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

(Fraud)

65. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 64 of this Complaint as if fully set forth in this Paragraph.

66. As discussed above, during the negotiation of the ExcelStor Agreement in 2003 and 2004, Papst, via its primary contract negotiators Jerold Schnayer and Tobias Kessler (among others), led ExcelStor to believe that the ExcelStor Agreement would not obligate ExcelStor to make royalty payments for Hitachi-ExcelStor Contract Drives, and that any payments made for

such drives would be reimbursed to ExcelStor. In doing so, Papst, via its primary contract negotiators Jerold Schnayer and Tobias Kessler (among others), concealed from ExcelStor (via its contract negotiators Der-Chang Hsieh and Paul Loh) the material fact that Papst had entered into an agreement and/or expected to enter into an agreement with Hitachi that in Papst's view would require ExcelStor to pay per-unit royalties to Papst for hard disk drive products that ExcelStor contract manufactured for Hitachi based on some unusual language Papst had inserted into the 2004 Hitachi Agreement, and that Papst therefore expected to collect and would insist on collecting royalties from ExcelStor for ExcelStor's manufacture of such products. Papst, via its primary contract negotiators Jerold Schnayer and Tobias Kessler (among others), also made fraudulent representations and false promises to ExcelStor (via its contract negotiators Der-Chang Hsieh and Paul Loh) that Papst would notify ExcelStor if Papst had been paid a royalty by anyone other than ExcelStor for the HDDs that ExcelStor "contract manufactures" for ExcelStor customers, such as Hitachi, and that any patent royalty payment made by ExcelStor for such HDDs would be reimbursed by Papst.

67. In addition, following the execution of the ExcelStor Agreement, Papst (via George Papst) repeatedly made false representations in correspondence to ExcelStor (via Der-Chang Hsieh), including quarterly notice letters dated April 2, 2004, June 24, 2004, December 21, 2004, April 14, 2005, June 28, 2005, September 15, 2005, April 4, 2006, August 10, 2006, September 20, 2006, January 17, 2007, and May 31, 2007, as more specifically referenced above. In particular, Papst falsely represented that that "no company other than ExcelStor has paid to Papst Licensing a royalty concerning the above-identified Contract Manufacturing HDDs" and falsely represented that Papst was not obligated to reimburse ExcelStor any portion of the royalty payment made for the Hitachi-ExcelStor Contract Drives.

68. Papst made the false representations and promises and fraudulently concealed information as set forth above with the intention to deceive ExcelStor, and particularly to induce the false belief that Papst did not expect to collect and would not insist on collecting royalties from ExcelStor for products that ExcelStor contract manufactured for Hitachi.

69. Given the nature of the information concealed by Papst and Papst's false

representations and false promises, ExcelStor could not have discovered through reasonable inquiry, and did not discover, that Papst expected to collect and would insist on collecting royalties from ExcelStor for products that ExcelStor contract manufactured for Hitachi. To the contrary, the information regarding Papst's negotiations and agreements with Hitachi and its own intentions was uniquely in Papst's possession and was not reasonably accessible to ExcelStor. Papst's fraudulent course of conduct led ExcelStor to reasonably believe that Papst did not expect to collect and would not retain royalties from ExcelStor for products that ExcelStor contract manufactured for Hitachi.

70. Under the circumstances as set forth in more detail above, Papst occupied a position of influence and superiority in its negotiation with ExcelStor. Given this position of influence and superiority, and particularly given the materiality of the information at issue, Papst had an opportunity and duty to disclose that it expected to collect and would insist on collecting royalties from ExcelStor for products that ExcelStor contract manufactured for Hitachi based on certain unusual terms that Papst had inserted into the Hitachi Agreements.

71. ExcelStor relied on Papst's fraudulent course of conduct by entering into the ExcelStor Agreement and by continuing to make royalty payments to Papst pursuant to that Agreement. If ExcelStor had known that Papst expected to collect and would insist on collecting royalties from ExcelStor for products that ExcelStor contract manufactured for Hitachi, ExcelStor would not have entered into the ExcelStor Agreement and would not have made royalty payments to Papst.

72. ExcelStor is informed and believes that Papst's fraudulent concealment of material facts, false representations and false promises were deliberate and willful in view of Papst's knowledge of the Hitachi License Agreements, Hitachi's payment of royalties to Papst, and the ExcelStor Agreement.

73. As a direct and proximate result of Papst's fraud, ExcelStor has been damaged in an amount to be determined at trial, but in excess of $7,989,360.

74. In the course of Papst's fraudulent conduct, Papst has been guilty of malice, fraud and/or oppression, thereby entitling ExcelStor to recover punitive damages in an amount to be determined at trial.

**SEVENTH CAUSE OF ACTION**
(Unfair Business Practices)

75. ExcelStor repeats and realleges each of the allegations set forth in Paragraphs 1 through 74 of this Complaint as if fully set forth in this Paragraph.

76. Papst's actions in enforcing its patents in and against entities incorporated or headquartered in California, in making fraudulent statements to ExcelStor and perhaps others in California, in fraudulently inducing ExcelStor to enter into the ExcelStor Agreement in California, and in fraudulently covering up its misconduct by making fraudulent representations directed at California constitute an unfair business practice under Business & Professions Code Section 17200. Moreover, Papst's unfair business practices have had an impact on ExcelStor Technology, Inc. in California, where its principal place of business is now located and its principal managing employee has been located at all relevant times.

77. As a result of Papst's unfair business practices, ExcelStor is entitled to temporary, preliminary and/or permanent injunctive relief barring Papst from further engaging in its unfair and unlawful patent enforcement and licensing practices. In addition, ExcelStor is entitled to restitution in an amount in excess of $10,600,000, which represents the amount of royalties that Papst has improperly collected from ExcelStor by virtue of its unlawful business practices and on patents that are unenforceable due to Papst's acts of patent misuse.

**PRAYER FOR RELIEF**

WHEREFORE, ExcelStor requests entry of judgment in its favor and against Papst as follows:

A. Declaring that each of the Papst HDD Patents is unenforceable due to patent misuse;

B. Declaring that ExcelStor cannot be liable for infringing the Papst HDD Patents because they are unenforceable;

C. Declaring that the ExcelStor Agreement is illegal and void insofar as it purports to require ExcelStor to pay royalties for Hitachi-ExcelStor Contract Drives or other HDDs that ExcelStor "contract manufactures" for its customers for which royalties

have already been paid, or to the extent it purports to require ExcelStor to pay patent royalties for product manufactured and sold in countries in which Papst has no patent protection;

D. Directing Papst to reimburse ExcelStor in full for the patent royalties paid by ExcelStor to Papst in connection with the ExcelStor Agreement, which amounts exceed $10,600,000;

E. Awarding ExcelStor damages in an amount adequate to compensate ExcelStor for Papst's breach of contract, breach of implied covenant of good faith and fair dealing, unjust enrichment, conversion and fraudulent concealment in an amount to be proven at trial, but not less than $7,989,360;

F. Awarding ExcelStor pre- and post-judgment interest;

G. Awarding ExcelStor the costs incurred in this action, together with reasonable attorneys' fees;

H. Awarding ExcelStor punitive damages in an amount to be proven at trial; and

I. Granting such other and further relief as the Court deems just and proper.

Dated: November 20, 2009

CARR & FERRELL *LLP*

By: /s/ Kenneth B. Wilson

KENNETH B. WILSON
CHRISTOPHER P. GREWE

Attorneys for Plaintiffs
EXCELSTOR TECHNOLOGY, INC.,
EXCELSTOR TECHNOLOGY LIMITED,
EXCELSTOR GROUP LIMITED,
EXCELSTOR GREAT WALL TECHNOLOGY LIMITED and SHENZHEN EXCELSTOR TECHNOLOGY LIMITED

**DEMAND FOR JURY TRIAL**

ExcelStor hereby demands trial by jury of all issues so triable.

Dated: November 20, 2009

CARR & FERRELL *LLP*

By: /s/ Kenneth B. Wilson
KENNETH B. WILSON
CHRISTOPHER P. GREWE

Attorneys for Plaintiffs
EXCELSTOR TECHNOLOGY, INC.,
EXCELSTOR TECHNOLOGY LIMITED,
EXCELSTOR GROUP LIMITED,
EXCELSTOR GREAT WALL TECHNOLOGY LIMITED and SHENZHEN EXCELSTOR TECHNOLOGY LIMITED